PHYSICIANS NATIONAL HOUSE STAFF ASSOCIATION et al., Appellants,

v.

John H. FANNING et al.

No. 78–1209.

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Oct. 9, 1979.

Decided July 11, 1980.

As Amended July 30, 1980.

Certiorari Denied Feb. 23, 1981. See 101 S.Ct. 1360.

Murray A. Gordon, New York City, a member of the bar of the Supreme Court of New York, pro hac vice by special leave of Court, with whom Abraham L. Zwerdling, Janet Kohn, Washington, D.C., and Bernard Katz, New York City, were on brief, for appellants.

Ruth E. Peters, Atty., N.L.R.B., Washington, D.C., a member of the bar of the

Supreme Court of Massachusetts, pro hac vice by special leave of Court with whom John S. Irving, Gen. Counsel, Margery E. Lieber, Deputy Asst. Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on brief, for appellees.

Carl W. Vogt, Washington, D.C., was on the brief for amicus curiae, Ass'n of American Medical Colleges, et al., in support of petition for rehearing en banc.

George G. Gallantz, Washington, D.C., was on brief, for amicus curiae, Greater New York Hospital Ass'n., et al., in support of petition for rehearing en banc.

Carl Taylor and Aileen A. Armstrong, Attys., N.L.R.B., Washington, D.C., entered appearances for appellees.

Before WRIGHT, Chief Judge, and McGOWAN, TAMM, LEVENTHAL,* ROBINSON, MacKINNON, ROBB, WILKEY, WALD and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

The appellants are the house staff associations of four private, non-profit hospitals, and a national house staff organization. House staffs consist of physicians serving as interns, residents and clinical fellows, and participating in hospital-based training programs in medical specialties or sub-specialties. They render medical services to patients, subject to the direction and control of the hospitals. They receive salaries or stipends and other hospital compensation and benefits, and are subject to statutes providing for workmen's compensation and unemployment benefits.

The 1974 amendments to the National Labor Relations Act, Pub. L. No. 93–360, 88 Stat. 395, removed the exemption of private non-profit hospitals from the Act's definition of "employer". Thereafter at various times during 1974 and 1975 the appellants petitioned the National Labor Relations Board for certification as collective bargaining representatives of their members. They contended that members of house staffs are "employees" under section 2(3) of the Act, 29 U.S.C. § 152(3).[1] The Board dismissed each petition, upon the ground that members of house staffs are "primarily students" and therefore not employees within the meaning of the Act. *Cedars-Sinai Medical Center*, 223 N.L.R.B. 251 (1976).[2]

---

* Judge Leventhal participated in the argument in this case but died before the opinion issued.
 Circuit Judge Edwards did not participate in the argument or decision of the case.

1. Section 2(3), 29 U.S.C. § 152(3) (1976) provides:
 The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any

other person who is not an employer as herein defined.

2. *Cedars-Sinai* has been followed by the Board in a number of other decisions. *St. Christopher's Hospital for Children*, 223 N.L.R.B. 166 (1976); *St. Clare's Hospital and Health Center*, 223 N.L.R.B. 1002 (1976); *University of Chicago Hospitals and Clinics*, 223 N.L.R.B. 1032 (1976); *Buffalo General Hospital*, 224 N.L.R.B. 76 (1976); *Kansas City General Hospital*, 225 N.L.R.B. 108 (1976); *Wayne State University*, 226 N.L.R.B. 1062 (1976). The Court of Appeals for the Second Circuit has upheld the Board's position that these decisions also preempt state labor relations boards from asserting jurisdiction over house staff. *NLRB v. Committee of Interns and Residents*, 566 F.2d 810 (2d Cir. 1977), cert. denied, 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 495 (1978). The preemption issue is however not before us; and the Second Circuit court expressly recognized that the issue presented to us in this case was not presented there. 566 F.2d at 816.

Dissatisfied with the Board's decision in their cases the appellants filed suit in the District Court, seeking a declaration that house staffs are employees within the meaning of the Act and an order directing the Board to accept jurisdiction over the petitions for certification. The District Court dismissed the action for lack of jurisdiction, holding that "Absent a plain violation of a mandatory provision of the National Labor Relations Act, this court may not strike down the Board's order denying plaintiffs the status of labor organization." *Physicians National House Staff Ass'n v. Murphy*, 443 F.Supp. 806, 811 (D.D.C.1978). On appeal, a panel of this court, in reliance upon *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) reversed the judgment of the District Court. Thereafter we granted rehearing *en banc* and vacated the panel's opinion. We now affirm the judgment of the District Court.

 Board orders in representation proceedings have long been held to be unreviewable unless they become the subject of unfair labor practice orders under section 10 of the Act, 29 U.S.C. § 160 (1976). Thus, an employer who believes the Board has included in a bargaining unit persons who are not employees within the meaning of the Act must await the outcome of an election, refuse to bargain with the union certified by the Board, and defend against an unfair labor practice complaint by asserting that the Board erred in determining who the employees were. *AFL v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940); *Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); *see Switchmen's Union v. National Mediation Board*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943). The record compiled in the representation proceedings is considered by the Court of Appeals when it reviews the unfair labor practice order. 29 U.S.C. § 159(d) (1976). In *Leedom v. Kyne*, however, the Supreme Court held that in the limited circumstances of that case a district court

had jurisdiction over a suit to set aside a Board order in a representation proceeding. The question before us is whether under the rule announced in the *Kyne* case the District Court had jurisdiction over the appellants' challenge to the Board's order.

In *Leedom v. Kyne* the Board had included both professional and non-professional employees in a unit which it found to be appropriate for collective bargaining purposes. Section 9(b)(1) of the National Labor Relations Act, 29 U.S.C. § 159(b)(1) (1976), directs that "the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit." Notwithstanding this flat statutory prohibition the Board refused to take a vote among the professional employees to determine whether a majority of them would vote for inclusion in the unit with non-professional employees. An election was held and a union of which Kyne was president was certified by the Board as the collective bargaining agent for the unit. Thereafter Kyne sued in the District Court, alleging that the Board had exceeded its statutory power by including the professional employees without their consent in a unit with non-professional employees, in violation of the express command of section 9(b)(1). He prayed that the Board's action be set aside.

 The Supreme Court held that in the circumstances, 28 U.S.C. § 1337 (1976)[3] gave the district court jurisdiction "to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act." 358 U.S. at 188, 79 S.Ct. at 184. By the language used to describe the Board's determination the Court carefully and clearly delineated the narrow scope of its holding: "made in excess of its powers", *id.* at 185, 79 S.Ct. at 182; "disobeyed the express command of § 9(b)(1) . . . and in

---

**3.** 28 U.S.C. § 1337 (1976):

The district court shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

doing so . . . acted in excess of its powers", *id.* at 186–87, 79 S.Ct. at 183; "an attempted exercise of power that had been specifically withheld", *id.* at 189, 79 S.Ct. at 184; "agency action taken in excess of delegated powers", *id.* at 190, 79 S.Ct. at 185. The Court explicitly stated that the suit was "not one to 'review', in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction." *Id.* at 188, 79 S.Ct. at 184. Thus in order to qualify for the *Leedom v. Kyne* exception a plaintiff must be able to identify a specific provision of the Act which, although it is "clear and mandatory", *id.* at 188, 79 S.Ct. at 183, has nevertheless been violated by the Board. That the Board may have made an error of fact or law is insufficient; the Board must have acted without statutory authority.[4]

■ The federal courts have consistently recognized the limits imposed by the *Kyne* decision. For example, in *Local 130, IUERMW v. McCulloch*, 120 U.S.App.D.C. 196, 345 F.2d 90 (1965), this court held that

to say that there are possible infirmities in an action taken by the Board by reason of an erroneous or arbitrary exertion of its authority in respect of the facts before it is not to conclude that there is jurisdiction in the District Court to intervene by injunction. For such jurisdiction to exist, the Board must have stepped so plainly beyond the bounds of the Act, or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court even before the Board's own processes have run their course.

*Id.* at 201, 345 F.2d at 95.

Similarly, the Court of Appeals for the Seventh Circuit has recently held:

Jurisdiction is not present simply because the NLRB has made an error of law in a

certification proceeding; jurisdiction is warranted only if the NLRB has violated a clear and specific statutory directive. *Chicago Truck Drivers v. NLRB*, 599 F.2d 816, 819 (7th Cir. 1979). *See also McCulloch v. Libbey-Owens-Ford Glass Co.*, 131 U.S. App.D.C. 190, 191, 403 F.2d 916, 917 (1968), *cert. denied*, 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969); *Machinery Employees Local 714 v. Madden*, 343 F.2d 497, 499 (7th Cir.), *cert. denied*, 382 U.S. 822, 86 S.Ct. 53, 15 L.Ed.2d 69 (1965); *Cihacek v. NLRB*, 464 F.Supp. 940, 944 (D.Neb.1979); *National Maritime Union v. NLRB*, 375 F.Supp. 421, 434 (E.D.Pa.), *aff'd without opinion*, 506 F.2d 1052 (3d Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). These cases make it clear that appellants can succeed here only by demonstrating that the Board violated some specific command of the National Labor Relations Act which mandated a determination that house staff are "employees" eligible to participate in union certification elections. We hold that appellants have not made that demonstration.

■ The appellants attempt to find in section 2(3) of the Act, 29 U.S.C. § 152(3) (1976),[5] the clear statutory mandate required by *Leedom v. Kyne*. We think the attempt fails. That section does not define the term employee nor does any other section of the Act. Whether a particular individual is an employee depends upon the facts. The task of decision on the facts of each case is assigned to the National Labor Relations Board and in making that decision the Board exercises its informed discretion. *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); *NLRB v. E. C. Atkins & Co.*, 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947); *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977). As

---

4. The jurisdiction of the district courts recognized by *Leedom v. Kyne* has been compared to the jurisdiction of a court of appeals in a mandamus proceeding. *See* L. Jaffe, Judicial Control of Administrative Action 348 (1965). *See also Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151 (1979), concurring opinion of Leventhal, J., at 8. In both situations, the mere possibility that the decision being re-

viewed is erroneous is not sufficient to support jurisdiction. The party seeking relief must show that the court or agency which made the decision had no authority to do so. *See, e. g., In re United States*, 194 U.S.App.D.C. 314, 598 F.2d 233 (1979).

5. *See* note 1 *supra*.

the Supreme Court said in *NLRB v. Hearst Publications, Inc., supra*, 322 U.S. at 130, 64 S.Ct. at 860:

It is not necessary in this case to make a completely definitive limitation around the term "employee". That task has been assigned primarily to the agency created by Congress to administer the Act. Determination of "where all the conditions of the relation require protection" involves inquiries for the Board charged with this duty. Everyday experience in the administration of the statute gives it familiarity with the circumstances and backgrounds of employment relationships in various industries, with the abilities and needs of the workers for self-organization and collective action, and with the adaptability of collective bargaining for the peaceful settlement of their disputes with their employers. The experience thus acquired must be brought frequently to bear on the question who is an employee under the Act. Resolving that question, like determining whether unfair labor practices have been committed, "belongs to the usual administrative routine" of the Board. *Gray v. Powell*, 314 U.S. 402, 411 [62 S.Ct. 326, 332, 86 L.Ed. 301].

[footnote omitted]

In this case the Board carefully analyzed the facts and reached the conclusion that interns, residents, and clinical fellows are primarily engaged in graduate educational training and that their status is therefore that of students rather than of employees; that the programs in which they participate were "designed not for the purpose of meeting the hospital's staffing requirements, but rather to allow the student to develop, in a hospital setting, the clinical judgment and the proficiency in clinical skills necessary to the practice of medicine in the area of his choice." *Cedars-Sinai Medical Center*, 223 N.L.R.B., 251, 253 (1976). In making this determination the Board acted within its jurisdiction. Its conclusion could not be reviewed by the District Court.

Appellants contend that because house staff are not specifically excluded from the protections of the Act by section 2(3), 29 U.S.C. § 152(3) (1976), the Board's finding that they "possess certain employee characteristics", 223 N.L.R.B. at 251, required the Board to classify them as employees. This argument cannot stand in light of *NLRB v. Bell Aerospace Corp.*, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), which held that managerial employees are not covered by the Act although they are not specifically excluded from the reach of section 2(3). This decision means that for policy reasons persons who are literally "employees" may nonetheless be excluded from coverage under the Act. *See also Allied Chemical Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 168, 92 S.Ct. 383, 391, 30 L.Ed.2d 341 (1971). It is difficult to see, therefore, how section 2(3) can be read as a mandate requiring the Board to consider all persons who "possess certain employee characteristics" as employees covered by the Act.

The Act's definition of "professional employees" does not help the appellants as they suggest. Section 2(12) of the Act, 29 U.S.C. § 152(12) (1976) states:

The term "professional employee" means—

(a) any employee engaged in work . . .
(iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital . . . or
(b) any employee, who (i) has completed the courses of specialized intellectual instruction and study described in clause (iv) of paragraph (a), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (a).

Because this definition is applicable to "any employee", it is not a command to the Board to regard anyone as an employee. Rather, it classifies those persons who are already employees. House staff can not be "professional employees" unless they are first found to be "employees".

Appellants argue alternatively that the necessary specific mandate to the Board may be discerned in the legislative history of the 1974 amendments. We disagree. A careful examination of both the language and legislative history of the amendments reveals that Congress was not directing the Board to classify house staff as employees.

The amendments included private non-profit hospitals within the definition of "employer", but they made no attempt to define "employee" nor did they require any change in the Board's procedures for determining who is an employee. The conclusion is inescapable that Congress intended the Board to determine the employee status of hospital workers in its usual manner—by analyzing the facts of each case. This conclusion is supported by the discussion of the Act's definition of "supervisor" in the reports of the congressional committees which considered the legislation. Discussing the application of that definition to health care professionals, both committees said they expected the Board to evaluate the facts of each case in its usual manner in deciding whether particular employees were supervisors. See H.R.Rep.No.93–1051 at 7 (1974); S.Rep.No.93–766 at 6 (1974), U.S.Code Cong. & Admin.News 1974, p. 3946.

It is reasonable to conclude that committees which expected the Board to follow its usual procedures in determining whether employees are supervisors also expected the Board to follow its usual procedures in determining whether persons are employees. At the very least, one would expect that if Congress were enacting a change in the Board's operations, the committees would have said so. Yet nothing in the committee reports gives any indication that Congress was ordering a departure from the usual procedure by directing the Board to find that house staff are employees.[6]

Finally, appellants refer us to remarks by Senator Cranston, one of the floor managers of the 1974 amendments, who specifically referred to the problems of house staff in urging that the bill be enacted. 120 Cong.Rec. 12937 (1974). These remarks, as well as passing references to house staff made by Senator Dominick, an opponent of the measure (Id. at 12971, 22580), indicate at most that these senators believed that the Board's evaluation of the facts would lead it to the conclusion that house staff are employees. They stop short of showing, however, that these senators thought the bill required that house staff be considered employees.

Given the absence of specific language mandating the result sought by appellants, it would require far more forceful indications in the legislative history to convince us that Congress, by telling the Board that members of a particular group must be treated as employees, mandated a significant change in Board procedures. In fact, the strongest evidence of congressional intent available to us supports the Board's position in this case. After we heard oral argument en banc, a bill designed to overrule the Board's house staff decisions by explicitly including house staff within the definition of employees (H.R.2222) was defeated in the House of Representatives.[7] Opponents of the bill stated their agreement with the NLRB's position that collective bargaining was inappropriate for house staff because their relationship with their hospitals was primarily an educational one. H.R.Rep.No.96–504 at 10–18 (1979) (minority views); 125 Cong.Rec. (daily ed., Nov. 28, 1979) at H 11300 (Rep. Erlenborn); Id. at H 11302 (Rep. Erdahl); Id. (Rep. Derwinski); Id. at H 11303 (Rep. Goldwater). The defeat of this bill casts substantial doubt upon appellants' contention that Congress by the

---

6. The Committees' discussion of the supervisor issue does refer to "health care professionals such as registered nurses, interns, residents, fellows and salaried physicians." House Report at 7; Senate Report at 6, U.S.Code Cong. & Admin.News 1974 at 3951. This reference is similar to the statements of senators discussed in the text. The discussion may indicate a

belief that the Board's analysis of the facts would lead it to conclude that house staff are employees, but it does not constitute a directive to the Board to arrive at such a conclusion.

7. Similar bills were introduced in the 94th Congress (H.R.15842) and the 95th Congress (H.R. 2222) but were never brought to a vote.

1974 amendments intended to direct the Board to regard house staff as employees.

Appellants emphasize that the Board's decisions in the house staff cases will never be subject to judicial review if the District Court is affirmed. We agree that it may be unlikely that the correctness of these decisions will be tested in an unfair labor practice proceeding reviewable in a court of appeals, but we think this is not a reason to permit District Court review. Congress has considered the likelihood that some Board decisions in representation proceedings may evade all judicial review. Nevertheless, it has rejected attempts to provide review in such cases.

When it passed the Taft-Hartley Act, Congress considered an amendment which would have allowed immediate review of Board certification decisions. This proposal was included in the House version of the bill, see H.R.Rep.No.245, 80th Cong., 1st Sess. 43 (1947). Among the arguments made in its favor was one quite similar to the one made by appellants here. The absence of immediate judicial review was described as "unfair to . . . the union that loses, which has no appeal at all no matter how wrong the certification may be [and to] the employees, who also have no appeal." *Id.* The provision was eliminated in conference. *See* H.R.Conf.Rep.No.510, 80th Cong., 1st Sess. 56–57 (1947), U.S.Code Serv.1947, p. 1135. Senator Taft explained this action by commenting that the proposal "would permit dilatory tactics in representation proceedings". 93 Cong.Rec. 6444 (1947). *See also Leedom v. Kyne*, 358 U.S. at 184, 197, 79 S.Ct. 180, 188, 3 L.Ed.2d 210 (1958) (Brennan, J. *dissenting*); *Cf. Switchmen's Union v. National Mediation Board*, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61 (1943).

Thus, Congress was aware that Board decisions such as the ones in this case might never be reviewed by a court and that this might cause hardship to a union. Nevertheless, Congress has not provided for judicial review. Appellants' argument based on the unavailability of review must therefore be rejected.

Courts have agreed that "it is not the unavailability of a remedy which triggers the *Kyne* exception, but the violation of a clear statutory demand." *Cihacek v. NLRB*, 464 F.Supp. 940, 944 (D.Neb.1979). In *Local 1545, United Bhd. of Carpenters v. Vincent*, 286 F.2d 127, 132 (2d Cir. 1960), the court said *Leedom v. Kyne* does not "recognize jurisdiction of the District Court to enjoin representation orders whenever there is a colorable allegation that the Board has misread the declared will of Congress and the remedy afforded by § 9(d) is likely to prove inadequate." And, in *National Maritime Union v. NLRB*, 375 F.Supp. 421, 439 (E.D.Pa.), *aff'd without opinion*, 506 F.2d 1052 (3d Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), the court concluded:

It may well be that the occasional injustice which results from this statutory scheme is too high a price to pay for expediting the vast majority of representation elections. It may also be that the Act should permit judicial review when unions are not certified under § 9(c). But as Mr. Justice (later Chief Justice) Stone concluded more than thirty years ago, "these are arguments to be addressed to Congress and not the courts." (quoting *AFL v. NLRB*, 308 U.S. 401, 411–12, 60 S.Ct. 300, 304–305, 84 L.Ed. 347 (1940)).

The legislative history and case law provide the answer to appellants' suggestions that affirmance of the District Court will mean that without being subject to judicial review the Board may decide that workers such as plumbers or carpenters are not "employees". It is clear that the extent to which the Board's decisions may be reviewed by the federal courts is within the control of Congress. That Congress has not expanded the scope of judicial review of the Board's certification decisions indicates that it is satisfied with the way the Board has been functioning.[8] A series of arbitrary or

---

8. The recent defeat of H.R.2222 indicates that Congress is satisfied with the very decisions challenged by appellants in this case.

irrational decisions by the Board might prompt Congress to insist upon a greater degree of judicial scrutiny. Unless Congress does so, however, the district courts are powerless to adjudicate the merits of certification decisions absent a clear violation of the National Labor Relations Act by the Board.

The 1974 amendments gave the Board jurisdiction over private, non-profit hospitals. The National Labor Relations Act however does not expressly command the Board to find that members of house staffs are employees. In the exercise of its jurisdiction the Board has determined that they are not employees. That decision is not reviewable in the District Court. The cause of action recognized by *Leedom v. Kyne* "is not one to 'review' . . . a decision of the Board made within its jurisdiction." 358 U.S. at 188, 79 S.Ct. at 184. The District Court correctly dismissed the complaint for lack of jurisdiction.

The judgment of the District Court is *Affirmed.*

J. SKELLY WRIGHT, Chief Judge, with whom Circuit Judges ROBINSON, WALD, and MIKVA join, dissenting:

The National Labor Relations Board (NLRB) denied appellants' petitions under the National Labor Relations Act (NLRA or Act) for certification as bargaining representatives for medical interns, residents, and fellows ("house staff").[1] The Board ruled that since house staff are primarily "students" rather than employees, they are not covered by the Act. Appellants then petitioned the District Court to declare that their members fall within the statutory definition of employees and to order the Board to assume jurisdiction of their certification petitions.[2] The District Court granted the NLRB's motion to dismiss for lack of jurisdiction because the Act provides for judicial review only of unfair labor practice (ULP) orders, as distinguished from refusals to certify bargaining representatives.[3] Citing *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), which identified a narrow exception to what has functioned as a prohibition of judicial review of non-ULP orders, appellants urge that Section 1337 of Title 28 confers jurisdiction over this action.[4] The court rejects appellants' *Kyne* contention and affirms the District Court. Because I think the *Kyne* exception applies to this case, I would reverse and remand for further proceedings.

## I

Restrictions on court review of NLRB rulings date from enactment of the NLRA in 1935. The previous year Congress had

1. *See Cedars-Sinai Medical Center*, 223 NLRB 251 (1976); *St. Christopher's Hospital for Children*, 223 NLRB 1032 (1976); *University of Chicago Hospitals and Clinics*, 223 NLRB 1002 (1976); *Buffalo General Hospital*, 224 NLRB 76 (1976); *Kansas City General Hospital*, 225 NLRB 108 (1976); *Wayne State University*, 226 NLRB 1062 (1976). In 1976 about two-thirds of the nation's 60,000 interns and residents belonged to the Physicians National House Staff Association, one of the appellants here. American Hospital Association, Taft-Hartley Amendments: Implications for the Health Care Field 55 (1976). The other appellants are house staff associations from Cedars-Sinai Medical Center, University of Chicago Hospitals and St. Christopher's Hospital, and the Committee of Interns and Residents.

2. The definition of employee under the Act is discussed in Part II–A *infra*. The NLRB has successfully argued to the Second Circuit that even though the Board will not regulate house staff-hospital labor relations, the national labor policy preempts any state jurisdiction over house staff. *NLRB v. Committee of Interns & Residents*, 566 F.2d 810 (2d Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 495 (1978). The court expressly withheld judgment on the question before us today. *Id.* at 816. As a result, house staff do not currently enjoy any of the rights or bear any of the obligations imposed by the NLRA.

3. *Physicians Nat'l House Staff Ass'n v. Murphy*, 443 F.Supp. 806 (D. D.C. 1978). Section 8 of the Act defines unfair labor practices by both unions and employers. 29 U.S.C. § 158 (1976).

4. 28 U.S.C. § 1337 (1976):
 The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies.

approved Public Resolution 44 to implement the labor provisions of the National Industrial Recovery Act.[5] Congress judged Public Resolution 44 a failure, however, because it permitted judicial review of bargaining representative certification and thereby put off collective bargaining. One committee report complained that under Public Resolution 44 "any attempt by the Government to conduct an election of [bargaining] representatives may be contested *ab initio* in the courts, although such election is in reality merely a preliminary determination of fact."[6] In response to this problem the NLRA provided for court review of only unfair labor practice orders.[7] The legislative history demonstrates a clear intent to prevent appeals to the judiciary before workers can elect bargaining representatives.[8] To achieve "prompt initiation of the collective-bargaining process," Congress restricted "time-consuming" judicial review that "might defeat the objectives of the national labor policy."[9] Despite attempts during consideration of the Taft-Hartley Amendments of 1947 to expand recourse to the courts, the legislation as passed did not disturb this limitation.[10]

Consequently, the current version of the NLRA still aims to foreclose use of the courts to delay the advent of collective bargaining. Section 10(f) permits direct review by the Courts of Appeals, but only after the Board issues an unfair labor practice order.[11] And the provision establishing the certification proceedings involved in this suit similarly authorizes court appeal only of an unfair labor practice order.[12]

In *American Federation of Labor v. NLRB*, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940), the Supreme Court first suggested, though it did not hold, that NLRB actions short of unfair labor practice orders might nevertheless be contested in court. In that case the Court declined to rule on the Board's claim that no judicial review whatever was available for non-ULP orders. The issue, the Court said,

> involves a determination whether the Wagner Act [NLRA], in so far as it has given legally enforceable rights, has deprived the district courts of some portion of their original jurisdiction conferred by § 24 of the Judicial Code [the predecessor to 28 U.S.C. § 1337]. It can be appropriately answered only upon a showing in such a suit that unlawful action of the Board has inflicted an injury on the petitioners for which the law, apart from the review provisions of the Wagner Act, affords a remedy. * * *

308 U.S. at 412, 60 S.Ct. at 305–306. The Court applied this approach in *Inland Em-*

---

**5.** 48 Stat. 1183. Public Resolution 44 established enforcement machinery to administer § 7(a) of the National Industrial Recovery Act, 48 Stat. 195, 198, which required that NIRA industrial codes guarantee workers "the right to organize and bargain collectively through representatives of their own choosing * *."

**6.** S.Rep. No. 573, 74th Cong., 1st Sess. 5 (1935). *See* H.R. Rep. No. 1147, 74th Cong., 1st Sess. 6, 23 (1935); Comment, 50 Iowa L. Rev. 931, 933–934 (1965); Note, 8 Buff. L. Rev. 372, 377 (1959).

**7.** Pub. L. No. 74–198, 49 Stat. 449, 455 (1935).

**8.** *See American Federation of Labor v. NLRB*, 308 U.S. 401, 411, 60 S.Ct. 300, 305, 84 L.Ed. 347 (1940) ("The conclusion is unavoidable that Congress, as the result of a deliberate choice of conflicting policies, has excluded representation certifications of the Board from the review by federal appellate courts authorized by the Wagner Act except [following unfair labor practice orders]."); *Inland Empire Council v. Millis*, 325 U.S. 697, 708, 65 S.Ct. 1316, 1322, 89

L.Ed. 1877 (1945); *Leedom v. Kyne*, 358 U.S. 184, 191–194, 79 S.Ct. 180, 185–186, 3 L.Ed.2d 210 (1958) (Brennan, J., dissenting).

**9.** *Leedom v. Kyne, supra* note 8, 358 U.S. at 192–193, 79 S.Ct. at 185–186 (Brennan, J., dissenting).

**10.** The House of Representatives initially approved an expansion of District Court review of NLRB certifications. *See* H.R. Rep. No. 245, 80th Cong., 1st Sess. 43, 59–60 (1947). The Senate refused to agree to that change, and it was abandoned in conference. H.R. Rep. No. 510, 80th Cong., 1st Sess. 56–57 (1947).

**11.** National Labor Relations Act § 10(f), 29 U.S.C. § 160(f) (1976).

**12.** *Id.* § 9(d), 29 U.S.C. § 159(d) (1976). Thus the traditional method of obtaining judicial review of a certification proceeding is through a subsequent ULP order.

*pire Council v. Millis,* 325 U.S. 697, 65 S.Ct. 1316, 89 L.Ed. 1877 (1945). After losing a representation election to another union, the Inland Empire Council challenged the Board's pre-election procedures and protested the exclusion of certain employees from voting. The Board rejected the complaint, and the union sued in District Court. The Supreme Court found that the losing union had failed to show that the Board had "depart[ed] from statutory requirements or from those of due process of law," *id.* at 700, 65 S.Ct. at 1318, so the courts lacked jurisdiction of the claim.

The Supreme Court did not return to this issue until *Leedom v. Kyne, supra,* in 1958.[13] In *Kyne* the Board had certified as a bargaining unit a group of 233 professional employees and nine nonprofessional workers at the Westinghouse Electric Plant in Cheektowaga, New York. 358 U.S. at 185–186, 79 S.Ct. at 182. The Board's order was in apparent violation of Section 9(b)(1) of the NLRA, 29 U.S.C. § 159(b)(1) (1976), which commands that bargaining units shall not include both professional and nonprofessional employees without prior approval of the professional workers. The Board did not deny its violation of Section 9(b)(1), but argued simply that the District Court lacked jurisdiction of the suit under the Act. The Supreme Court, however, held that the Board's action could be challenged:

> This suit is not one to "review," in the sense of that term as used in the Act, a decision of the Board made within its jurisdiction. Rather it is one to strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act. Section 9(b)(1) is clear and mandatory. * * * [The Board] deprived the professional employees of a "right" assured to them by Congress. Surely, in these

circumstances, a Federal District Court has jurisdiction of an original suit to prevent deprivation of a right so given. 358 U.S. at 188–189, 79 S.Ct. at 184.

The *Kyne* Court's concentration on the "rights" of the employees under the NLRA highlights the issues presented by the case before us. The Court pointed out that if jurisdiction were lacking, there would be " 'a sacrifice or obliteration of a right which Congress' has given professional employees, for there is no other means, within their control * * *, to protect and enforce that right." *Id.* at 190, 79 S.Ct. at 185, *quoting Switchmen's Union of North America v. NMB,* 320 U.S. 297, 300, 64 S.Ct. 95, 96, 88 L.Ed. 61 (1943). The opinion concluded, "This Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." 358 U.S. at 190, 79 S.Ct. at 185.

The exception to nonreviewability of non-ULP orders has been applied infrequently.[14] In 1963 the Supreme Court found District Court jurisdiction in a case implicating foreign affairs matters,[15] but the Court did not apply *Kyne* in its only other decision on this issue, *Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). That decision concerned the NLRB's ruling that Greyhound was a joint employer of maintenance crews that were directly employed by another firm under contract to Greyhound. Pointing to the "painstakingly delineated procedural boundaries of *Kyne,*" the *Boire* Court held that Greyhound's identity as a joint employer was "essentially a factual issue, unlike the question in *Kyne,* which depended solely upon construction of the statute." *Id.* at 481, 84 S.Ct. at 899. Because "[t]he *Kyne* exception is a narrow one," the Court refused to extend it "to permit plenary district court review of

---

13. The Second Circuit recognized District Court jurisdiction of *constitutional* challenges to non-ULP orders in 1949. *Fay v. Douds,* 172 F.2d 720, 723 (2d Cir. 1949); *see Fitzgerald v. Douds,* 167 F.2d 714 (2d Cir. 1948).

14. *See* cases cited in note 17 *infra.*

15. *McCulloch v. Sociedad Nacional,* 372 U.S. 10, 17, 83 S.Ct. 671, 675, 9 L.Ed.2d 547 (1963) ("the presence of public questions particularly high in the scale of our national interest because of their international complexion is a uniquely compelling justification for prompt judicial resolution of the controversy over the Board's power").

Board orders in certification proceedings whenever it can be said that an erroneous assessment of the particular facts before the Board has led it to a conclusion which does not comport with the law." *Id.*

## II

This circuit, like the other lower courts, has been frugal in recognizing the *Kyne* exception. We have ruled repeatedly that "the showing that the Board has violated the Act * * * must be strong and clear"[16] before the equity powers of the District Courts may be invoked under Section 1337.[17] We have insisted that the alleged statutory duty of the Board in such suits must be "clear and mandatory," since "[e]quitable relief is clearly barred in the wide area of determinations which depend on the Board's expertise and discretion * * *."[18]

To preserve the Wagner Act's judgment that judicial review of non-ULP orders can obstruct collective bargaining, the equitable

purpose of the *Kyne* exception must be balanced against the need to limit recourse to the judiciary.[19] I agree with Professor Jaffe that the basis for court "intervention" in such cases must be "the type of gross transgression for which we invoke the label 'jurisdictional' or 'clear errors of law' * * *."[20] The factors relevant to this determination are (A) whether the alleged error by the Board involved a question of statutory interpretation or merely an issue of fact; (B) whether the statutory provision is "clear and mandatory" in creating rights for those subject to the NLRA; (C) whether the party challenging the Board's action has a realistic hope of eventual court review following an unfair labor practice order; and (D) the potential for thwarting the purposes of the NLRA which would flow from finding jurisdiction in this case.[21]

### A

If the District Court were correct that "[t]he question of the status of house staff

**16.** *McCulloch v. Libbey-Owens-Ford Glass Co.,* 403 F.2d 916, 917 (D.C. Cir. 1968), *cert. denied,* 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969).

**17.** *See Nat'l Ass'n of Women's & Children's Apparel Salesmen v. NLRB,* 465 F.2d 662 (D.C. Cir. 1972); *Internat'l Brhd of Teamsters v. Brhd of Railway, Airline & Steamship Clerks,* 402 F.2d 196 (D.C. Cir.), *cert. denied,* 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968); *Lawrence Typographical Union v. McCulloch,* 349 F.2d 704 (D.C. Cir. 1965); *Local 130, IUERMW v. McCulloch,* 345 F.2d 90 (D.C. Cir. 1965); *Kingsport Press, Inc. v. McCulloch,* 336 F.2d 753 (D.C. Cir.), *cert. denied,* 379 U.S. 931, 85 S.Ct. 330, 13 L.Ed.2d 343 (1964); *Milk & Ice Cream Drivers Union, Local 98 v. McCulloch,* 306 F.2d 763 (D.C. Cir. 1962); *Atlas Life Ins. Co. v. Leedom,* 284 F.2d 231 (D.C. Cir. 1960); *Leedom v. Internat'l Brhd of Electrical Wkrs,* 278 F.2d 237 (D.C. Cir. 1960); *Internat'l Ass'n of Tool Craftsmen v. Leedom,* 276 F.2d 514 (D.C. Cir.), *cert. denied,* 364 U.S. 815, 81 S.Ct. 45, 5 L.Ed.2d 46 (1960); *Leedom v. Norwich, Conn. Printing Specialties & Paper Products Union, Local 494,* 275 F.2d 628 (D.C. Cir.), *cert. denied,* 362 U.S. 969, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960); *Nat'l Biscuit Division v. Leedom,* 265 F.2d 101 (D.C. Cir.), *cert. denied,* 359 U.S. 1011, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959).

**18.** *Leedom v. Kyne,* 249 F.2d 490, 491 (D.C. Cir.), *aff'd,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).

**19.** Professor Cox concluded shortly after *Kyne* that the decision "places all NLRB certifications in the category of reviewable orders." Cox, *The Major Labor Decisions of the Supreme Court October Term 1958,* ABA Section of Labor Relations Law, 1959 Proceedings, *reprinted in* W. Gellhorn & C. Byse, Administrative Law 441, 443 (4th ed. 1960). In rejecting this view courts have focused on (1) the clarity of the alleged violation of the statute, *Internat'l Brhd of Teamsters v. Brhd of Railway, Airline & Steamship Clerks, supra* note 17, 402 F.2d at 205; and (2) available avenues to challenge the Board decision, *Cox v. McCulloch,* 315 F.2d 48, 50 (D.C. Cir. 1963). *See* Note, *supra* note 6, 8 Buff. L. Rev. at 383 ("inadequacy of review'" plus "factor of illegality").

**20.** L. Jaffe, Judicial Control of Administrative Action 348 (1965).

**21.** The jurisdictional inquiry involves some examination of the merits of appellants' argument. *See Internat'l Brhd of Teamsters v. Brhd of Railway, Airline & Steamship Clerks, supra* note 17, 402 F.2d at 199, 205. This is necessary if we are to preserve the policy of holding the courthouse door not "wholly closed," yet also not "widely ajar." *Local 130, IUERMW v. McCulloch, supra* note 17, 345 F.2d at 97.

members as employees or as students is primarily a factual and definitional determination of the type traditionally left to the discretion of the Board," [22] I would agree with the majority that there is no jurisdiction in the courts to hear this case. Appellants insist, however, that the legislative histories of the NLRA and the 1974 Health Care Amendments to that statute [23] affirmatively demonstrate a congressional intent to cover house staff under the Act. To decide this question it is necessary to examine the definition of "employee" under the Act and the effect of the 1974 Amendments.[24]

Section 2(3) of the NLRA, 29 U.S.C. § 152(3) (1976), provides: "The term 'employee' shall include any employee * * * unless this subchapter explicitly states otherwise * * *." The Supreme Court has held that "the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as 'employee,' * * * leaves no doubt that its applicability is to be determined broadly * * *." [25] The breadth of the definition has been retained through the express statutory exclusion of only a few groups of workers—agricultural workers, domestic laborers, family workers, independent contractors, and supervisory employees.[26] Notably, house staff are not excluded from the Act in terms.[27] Quite the reverse is true.

The Taft-Hartley Amendments distinguished between professional and nonprofessional employees for determination of appropriate bargaining units.[28] This distinction applies only after the Board has determined that workers fall within the definition of employee in Section 2(3). Nevertheless, it is plain that the definition of professional employee reflects the legislative understanding as to which workers

22. *Physicians Nat'l House Staff Ass'n v. Murphy, supra* note 3, 443 F.Supp. at 810. There is no dispute here as to what constitutes house staff. The only issue is whether they are employees under the Act.

23. Pub. L. No. 93–360, 88 Stat. 395 (1974).

24. *See Internat'l Brhd of Electrical Wkrs v. NLRB*, 487 F.2d 1143, 1170–1171 (D.C. Cir. 1973) (*en banc*), *aff'd sub nom. Florida Power & Light Co. v. Internat'l Brhd of Electrical Wkrs, Local 641*, 417 U.S. 790, 94 S.Ct. 2737, 41 L.Ed.2d 477 (1974):

In the final analysis, "administrative experience is of weight in judicial review only to this point—it is a persuasive reason for deference to the [Board] in the exercise of its discretionary powers under and within the law. It cannot be invoked to support action outside of the law. And what action is, and what is not, within the law must be determined by the courts, when authorized to review, no matter how much deference is due to the agency's fact finding. Surely an administrative agency is not a law unto itself * * *." * * *

*Quoting SEC v. Chenery Corp.*, 332 U.S. 194, 215, 67 S.Ct. 1575, 1760, 1762, 91 L.Ed. 1995 (1947) (Jackson, J., dissenting). *See also SEC v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 1712, 56 L.Ed.2d 148 (1978):

"The construction put on a statute by the agency charged with administering it is entitled to deference by the courts * * *. * * * But the courts are the final authorities on issues of statutory construction, *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 385 [85

S.Ct. 1035, 1042, 13 L.Ed.2d 904], and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.' *NLRB v. Brown*, 380 U.S. 278, 291 [85 S.Ct. 980, 988, 13 L.Ed.2d 839]." * * *

*Quoting Volkswagenwerk v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968).

25. *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 129, 64 S.Ct. 851, 859, 88 L.Ed. 1170 (1944) (footnote omitted).

26. Section 2(3), 29 U.S.C. § 152(3) (1976), excludes

any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or * * * employed by his parent or spouse, or * * * having the status of an independent contractor, or * * * employed as a supervisor, or * * * by an employer subject to the Railway Labor Act * * *.

27. Indeed, there was no exclusion for nonprofit hospitals in the NLRA until 1947, *see* note 31 *infra*, so there is no evidence in the Wagner Act of concern over the appropriateness of public regulation of labor relations in hospitals.

28. 2 NLRB, Legislative History of the Labor-Management Relations Act of 1947 at 1663–1664 (1948) (hereinafter cited as Legislative History).

fall within the broader definition of employee. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 297–298, 94 S.Ct. 1757, 1773, 40 L.Ed.2d 134 (1974) (White, J., dissenting). The relevant passage provides:

(12) The term "professional employee" means—

(a) any employee engaged in work * * (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital * * *; or

(b) any employee, who (i) has completed the courses of specialized intellectual instruction and study described in clause (iv) of paragraph (a), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (a).

29 U.S.C. § 152(12) (1976). The House Conference Report on the Taft-Hartley Act described this definition as applying to "such persons as legal, engineering, scientific and *medical personnel together with their junior professional assistants.*" [29] As NLRB Member (now Chairman) Fanning urged in dissent to one of the Board's house staff decisions, "[T]he definition fits, *precisely*, housestaff officers." [30]

In response to a spate of recognition strikes in the hospital industry, Congress extended NLRB jurisdiction to nonprofit health care facilities in the 1974 Health Care Amendments.[31] The legislative history of these amendments provides substan-

tial support for the view that Congress intended that house staff be covered by the NLRA. In Senate hearings spokesmen for appellants, while urging passage of the amendments, argued for a new provision specifying that house staff are not "supervisory employees" excluded from the coverage of the Act under Section 2(11).[32] The committee reports on the legislation explain why that suggestion was not adopted:

Various organizations representing health care professionals have urged [exclusion of] such professionals from the definition of "supervisor". The Committee has studied this definition with particular reference to health care professionals, such as * * * interns, residents, fellows, * * * and concludes that the proposed amendment is unnecessary * *. The Committee notes that the Board has carefully avoided applying the definition of "supervisor" to a health care professional who gives direction to other employees * * *, which direction is incidental to the professional's treatment of patients and thus is not the exercise of supervisory authority in the interest of the employer.[33]

The clear assumption underlying this discussion of the supervisory status of house staff is that they are otherwise within the definition of employee in the Act. Had Congress not considered them employees, their status as supervisors could not have been at issue since the term "supervisor" as used in the Act refers to a subcategory of "employees." [34] This view is buttressed by

---

**29.** H.R. Rep. No. 510, *supra* note 10, at 36 (emphasis added).

**30.** *Cedars-Sinai Medical Center, supra* note 1, 223 NLRB at 258 (Member Fanning, dissenting) (emphasis in original).

**31.** S. Rep. No. 766, 93d Cong., 2d Sess. 3 (1974); H. R. Rep. No. 1051, 93d Cong., 2d Sess. 4, 5 (1974). Under a provision offered from the floor of the Senate the Taft-Hartley Amendments had exempted nonprofit hospitals from the NLRA. H.R. Rep. No. 510, *supra* note 10, at 31–32; 2 Legislative History, *supra* note 28, at 1662.

**32.** *Coverage of Nonprofit Hospitals Under National Labor Relations Act, 1973: Hearings Be-*

*fore the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare*, 93d Cong., 1st Sess. 291–423 (Aug. 1, 1973).

**33.** S. Rep. No. 766, *supra* note 31, at 6; *see* H.R. Rep. No. 1051, *supra* note 31, at 7.

**34.** Neither the majority nor the Board is able to offer any explanation of how the committee reports could logically have addressed the question whether house staff are supervisory employees without assuming that they are employees under the Act. Instead the majority suggests that insofar as the committees expected the Board to follow its usual procedures in deciding whether house staff are supervisors, it may be assumed that the committees also ex-

comments on the floor of the Senate. In introducing the legislation Senator Cranston, co-manager of the bill, explained that the amendments would grant collective bargaining rights to "notoriously underpaid" hospital workers, including "doctors." [35] He added:

> According to [the] president of the Physicians National Housestaff Association, the average house staff officer—intern, resident, or fellow—works 70 to 100 hours per week, and earns about $10,000 per year. His hourly wage, then, ranges from $1.92 to $2.74.[36]

Senator Cranston would certainly not have cited interns in this statement unless he understood them to be covered by the legislation he was offering.

Even one of the opponents of the 1974 Health Care Amendments, Senator Dominick, referred repeatedly to the coverage of house staff under the bill, grouping house staff together with other hospital employees.[37] When the amendments came up for a final vote, he stated, "I know that nurses, staff physicians, and others are in favor of the principle of collective bargaining," [38] and added:

> I am sure as dedicated professional nurses, staff physicians, and other hospital employees * * * would never jeopardize their patients['] well being [sic]. The balancing of these groups' rights as employees to form bargaining units with the public interest in access to health care has given us some special features in this bill * * *. * * * [39]

In light of these congressional statements, I am compelled to agree with the Second Circuit's statement that Congress "considered housestaffs within the scope of the Health Care Amendments." [40] As employees under the NLRA, house staff may not be deprived of rights "assured to them by Congress." *Leedom v. Kyne, supra,* 358 U.S. at 189, 79 S.Ct. at 184. I reach this conclusion not on the basis of factual characteristics of the hospital industry or the work performed by house staff, but on the terms of the statute itself and its legislative history.[41]

---

pected the Board to follow its usual procedure in deciding whether house staff are employees. It should be noted, however, that the Board itself has not interpreted the committee statements about the supervisory status of house staff in the manner that the majority suggests. In its decision in *Kansas City General Hospital, supra* note 1, 225 NLRB at 109, the Board stated that "Congress, in passing the * * * amendments, * * * made a determination that [house staff] were not supervisors within the meaning of the Act[.]"

35. 120 Cong.Rec. 12937 (1974). As graduates of medical colleges and licensed physicians, house staff are, of course, doctors.

36. *Id.*

37. For example, Senator Dominick noted assurances he had received that if the nonprofit hospital exemption were removed "house staff physicians * * * would never go on strike." *Id.* at 12971.

38. *Id.* at 22580.

39. *Id.*

40. *NLRB v. Committee of Interns & Residents, supra* note 2, 566 F.2d at 815.

41. My consideration of the legislative history on this question is similar to the approach taken by both the majority and the dissenters in the Supreme Court in *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). Chief Justice Burger's opinion for the majority concluded after "close examination" of the legislative history of the NLRA that Congress did not extend the protections of the Act to church-operated schools, 440 U.S. at 504–507, 99 S.Ct. at 1320–1322, while Justice Brennan in dissent disputed the majority's view of the jurisdiction conferred by the statute. Because the Act does not use plain statutory language extending the Board's coverage to specific groups, both the Burger and Brennan opinions resort to the legislative history and refer to exactly the same legislative materials that I canvass today. Moreover, I believe that the specific congressional statements on house staff—including the statutory definition of professional employee, the accompanying committee explanation in 1947, and the committee statement and floor statements in 1974—easily satisfy the Chief Justice's requirement of "[a] clear expression of an affirmative intention." *Catholic Bishop, supra,* 440 U.S. at 504, 99 S.Ct. at 1320. In contrast, the dissent in *Catholic Bishop* cites only one statement by a prominent senator, *id.* at 515, 99 S.Ct. at 1326, and more general statements as to the breadth of NLRB jurisdiction over non-

**B**

Although I conclude that the Board misconstrued a provision of the NLRA, the *Kyne* exception requires violation of a "clear and mandatory" statutory requirement creating rights under the Act.[42] This criterion has not been interpreted woodenly, however. The Act clearly directs that employees receive the protections it provides. In *Miami Newspaper Printing Pressmen's Union Local 46 v. McCulloch*, 322 F.2d 993 (D.C. Cir. 1963), this court held that the *Kyne* exception applies to positive commands of the NLRA as well as to negative prohibitions as in *Kyne*.[43] *Miami Pressmen* also found that the statutory provision involved in that case, though "not mandatory in all instances," did impose a mandatory duty "[o]n these facts." [44]

My earlier discussion establishes the clarity of the congressional intent on this matter.[45] Satisfaction of the statutory definition involved here triggers specific Board action, after an appropriate petition for certification, to hold representation elections as required by Section 9(c)(1) of the Act, 29 U.S.C. § 159(c)(1) (1976).[46] By denying that house staff are employees under the Act the Board contravened the legislative direction that house staff and hospitals have access to Board-administered collective bargaining. Section 7 of the Act, 29 U.S.C. § 157 (1976),[47] provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *.

The "Findings and declaration of policy" in the NLRA echo this guarantee of employee rights,[48] and both the Board and the courts have the responsibility to enforce these rights.[49] In its decisions excluding house staff from its coverage the Board failed to satisfy this most fundamental mandate of the NLRA.

---

profit institutions, *id.* at 515 & n.7, 99 S.Ct. at 1326 & n.7. I certainly do not disparage the judgment of the four dissenting Justices that that legislative history was sufficient to establish Board jurisdiction over parochial school teachers, but I emphasize the greater support for my conclusion in the instant case.

**42.** *See Internat'l Brhd of Teamsters v. Brhd of Railway, Airline & Steamship Clerks, supra* note 17, 402 F.2d at 205 ("the assertion of jurisdiction [is confined] to cases where the error on the merits is as obvious on the face of the papers as the violation of specific statutory language"); *Lawrence Typographical Union v. McCulloch, supra* note 17, 349 F.2d at 706 n.3 ("A mere allegation in the complaint that the Board has violated the Act does not confer jurisdiction. The violation must be proved.").

**43.** *Miami Newspaper Printing Pressmen's Union Local 46 v. McCulloch*, 322 F.2d 993, 997 (D.C. Cir. 1963). *See Terminal Freight Handling Co. v. Solien*, 444 F.2d 699, 703 (8th Cir. 1971), *cert. denied*, 405 U.S. 996, 92 S.Ct. 1246, 31 L.Ed.2d 465 (1972); *Nat'l Maritime Union of America v. NLRB*, 375 F.Supp. 421, 429 (E.D. Pa.), *aff'd*, 506 F.2d 1052 (3d Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

**44.** *Miami Pressmen, supra* note 43, 322 F.2d at 997, 998.

**45.** *See* Part II–A *supra*.

**46.** The provision states that if, upon petition by "an employee or group of employees," the Board finds that "a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof."

**47.** *See also Central Hardware Co. v. NLRB*, 407 U.S. 539, 542–544, 92 S.Ct. 2238, 2240–2241, 33 L.Ed.2d 122 (1972); *NLRB v. Textile Wkrs Union of America, Local 1029*, 409 U.S. 213, 216, 93 S.Ct. 385, 386, 34 L.Ed.2d 422 (1972).

**48.** 29 U.S.C. § 151 (1976):

> It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

**49.** *See Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345 (3d Cir. 1969), *cert. denied*, 397 U.S. 935, 90 S.Ct. 943, 25 L.Ed.2d 115 (1970).

The only possible exception to the Board's duty in this case would be under Section 14(c) of the Act, which permits the Board to decline jurisdiction over employers having an insubstantial effect on commerce.[50] But the 1974 Health Care Amendments expressly extend NLRA coverage to the nonprofit hospitals that employ house staff, so no such issue is present in this case.

The majority does not really deny that under Section 2(3) house staff are employees covered by the Act. It simply argues that because neither Section 2(3) nor the legislative history of the Health Care Amendments specifically—in terms—says so, they are not entitled to the *Kyne* protection afforded other employees and thus are stripped of any protection under the Act.[51] In my view, neither Section 2(3) nor the legislative history of the Health Care Amendments supports any such bizarre interpretation.

Certainly a finding by this court that the Board violated a specific statutory mandate in this case must ultimately rest on a determination that house staff are employees within the meaning of the Act. But that determination need not be based on specific language in the statute or in legislative history so stating. The reason for examining the legislative histories of both the Taft-Hartley Act and the Health Care Amendments is to determine whether appellants are correct in claiming they show that Congress intended house staff to be employees under the Act. If they are right, and I believe I have shown that they are, the Board may not ignore that intent simply because it is not explicit in the statutory

language or its history. A statute can have only one accepted interpretation—derived from its language or its legislative history or both—and that interpretation is the one the Congress intended at the time the legislation was enacted.

Thus, in the particular circumstances of this case, Section 2(3), read in the light of the legislative intent to make house staff employees under the Act, provides the requisite "clear statutory mandate" that brings this case within the ambit of the *Kyne* doctrine.[52] That Congress did not specifically direct the Board to find house staff to be employees under the Act is not dispositive. In this regard the Supreme Court's decision in *NLRB v. Bell Aerospace Co., supra*, a case on which the majority relies, is instructive. The Court in that case addressed the question whether the Board had correctly determined that certain managerial employees were "employees" under the Act. After carefully canvassing the legislative history of the Taft-Hartley Amendments, the Court concluded that Congress had intended that such employees be excluded from coverage under the Act. 416 U.S. at 275, 283–284, 94 S.Ct. at 1766.[53] The Court reached this conclusion even though the statute does not specifically exclude managerial employees from its coverage, and despite the fact that nothing in the legislative history specifically directed the Board to exclude such employees. My examination of the legislative history of the Health Care Amendments to determine whether Congress understood house staff to

**50.** 29 U.S.C. § 164(c)(1) (1976):

The Board, in its discretion, may, by rule of decision or by published rules * * *, decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction[.]

*See Hotel Employees Local No. 255 v. Leedom*, 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143 (1958); *Office Employes Internat'l Union, Local No. 11 v. NLRB*, 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957).

**51.** *See* text and notes at notes 61, 64–67 *infra.*

**52.** It should be pointed out that the reason why the committee reports did not specifically direct the Board to find house staff to be employees was that at no time during the hearings and debates on the amendments was there any suggestion that house staff might not be entitled to coverage under the Act. *See* 642 F.2d at 510–511 *infra.*

**53.** The Court also noted that prior decisions by the Board and the Courts of Appeals all pointed to the conclusion that managerial employees are not covered by the Act.

be employees directly parallels the Supreme Court's approach in *Bell Aerospace.*[54]

The majority interprets *Bell Aerospace* as having held that "for policy reasons persons who are literally 'employees' may nonetheless be excluded from coverage under the Act." Majority opinion, 642 F.2d at 497. Presumably this "policy" decision is to be made by the Board. But as I read *Bell Aerospace* the Supreme Court's decision that managerial employees are not covered by the Act did not rest on "policy reasons." Rather, the decision was based on what the Court, after a careful examination of the legislative history, determined the intent of Congress on this question to be. Thus, to find support for its decision in this case in *Bell Aerospace*, the majority must show that Congress intended to exclude house staff from coverage under the Act.[55] This, I submit, it has not done.

The majority describes the recent failure of the House of Representatives to adopt a bill that would have overruled the Board's house staff decisions by explicitly including house staff within the statutory definition of employees as "the strongest evidence of congressional intent available to us * *."[56] However, in assessing the relevance of this development to the case at bar it should be pointed out that the action of one house of Congress cannot be a basis from which to draw inferences about the intentions of the whole Congress. Moreover, insofar as the issue involved in this case is the congressional intent expressed in the legislative history of the Health Care Amendments, it must be remembered that our concern is with the intent and views of the 93rd Congress—the Congress that enacted these amendments.

The Supreme Court has consistently admonished against reading the mindset of one Congress from the actions of a subsequent Congress. In *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), the Court rejected the notion that opinions expressed by legislators many years after an Act was passed could be given any real weight. "We fail to see how the remarks of these Senators in 1943 can serve to change the legislative intent of Congress expressed in 1932 * *." *Id.* at 282, 67 S.Ct. at 690. It is well established that " 'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.' * * * [T]he abortive action of the subsequent Congress 'would not supplant the contemporaneous intent of the Congress which enacted the . . . Act.' " *Waterman S.S. Corp. v. United States*, 381 U.S. 252, 269, 85 S.Ct. 1389, 1398, 14 L.Ed.2d 370 (1965), quoting *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960), and *Fogarty v. United States*, 340 U.S. 8, 14, 71 S.Ct. 5, 8, 95 L.Ed. 10 (1950). Most recently, the same stricture was laid down by Chief Justice Burger, saying, "Legislative observations 10 years after passage of the Act are in no sense part of the legislative history." *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 200 n.7, 98 S.Ct. 444, 449 n.7, 54 L.Ed.2d 402 (1977). *See also United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 348–349, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963); *United States v. Wise*, 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962).

---

**54.** *See also* discussion of *NLRB v. Catholic Bishop of Chicago* in note 41 *supra*.

**55.** The majority also cites *Allied Chemical & Alkali Workers Local No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971), as standing for the proposition that "policy reasons" may justify exclusion of persons who are "literally employees" from the Act's coverage. However, in that case the Supreme Court simply held that retirees are not employees under the Act, pointing out that "the legislative history of § 2(3) itself indicates that the term 'employee' is not to be stretched beyond its plain meaning embracing only those who work for another for hire." 404 U.S. at 166, 92 S.Ct. at 391. Thus *Allied Chemical Workers* cannot be reconciled with the majority's suggestion here that the Board may decide that persons who are literally "employees" are nevertheless not employees for purposes of the Act, particularly in view of the Act's rather explicit directive that "[t]he term 'employee' shall include *any employee* * * * unless this subchapter explicitly states otherwise * * *." 29 U.S.C. § 152(3) (1976) (emphasis added).

**56.** *See* majority op., 642 F.2d at 498.

The pertinence of subsequent congressional action is even further diminished when, as is the case here, the "action" being cited is *inaction. United States v. United Mine Workers, supra.* In *United States v. Price, supra,* the taxpayer sought to have the Court reason from the refusal of a congressional committee to take action repudiating a judicial decision on which he relied. The Court refused, declaring that "[s]uch nonaction by Congress affords the most dubious foundation for drawing positive inferences." 361 U.S. at 310–311, 80 S.Ct. at 330. The majority seems to be suggesting that the inaction of one house of Congress is persuasive evidence of what a previous Congress meant to do when it acted in its full constitutional cycle. I am not persuaded.

It should also be noted that it is far from clear that the failure of the House to adopt the bill must be construed as an endorsement of the Board's house staff decisions. Although it is true, as the majority notes,[57] that some opponents of the bill stated their agreement with the Board's conclusion that house staff are not employees, it is also quite possible that other votes against the bill were based on different considerations. For example, some of the negative votes may simply reflect a reluctance on the part of some members of the House to abandon the Act's wise policy of requiring that "[t]he term 'employee' shall include any employee * * * unless this subchapter explicitly states otherwise," [58] in favor of listing all the groups of employees to be covered by the Act.

As previously noted, the majority's rejection of appellants' *Kyne* contention also rests on the fact that the committee reports accompanying the Health Care Amendments and the statements by Senators Cranston and Dominick do not explicitly state that Congress was directing the Board to find house staff to be employees under

the Act. What the majority omits to mention, however, is that at no time during Congress' consideration of the amendments was there any doubt that they applied to house staff or that house staff were employees under the Act. Both House and Senate committees held hearings on the legislation. Not one of the witnesses—which included representatives of the Department of Labor and the Association of American Medical Colleges, *amicus curiae* in the instant case—who testified at these hearings even suggested that house staff were not brought under the coverage of the Act by the proposed amendments because they are "primarily students" or for any other reason. Quite the contrary, the assumption was that the legislation would apply to house staff. Nor was there any reference to any student status of house staff during the floor debates on the amendments. Finally, there can be no suggestion that the reason why this issue was not raised was because the Congress and the parties concerned with the legislation were unaware of it. State labor relations boards in New York and Michigan had squarely ruled that house staff were employees under the labor relations acts of those states.[59] And representatives of the house staff organizations who testified at the hearings pointed out that house staff had been recognized as employees and had been engaging in collective bargaining under state law in New York and Minnesota.[60] As previously noted, the only issue about the status of house staff raised during the hearings concerned the attempt by representatives of the house staff organizations to persuade the committees to exclude house staff from the statutory definition of "supervisors." Not surprisingly, this was the only issue that was explicitly addressed in the committee reports. Given the complete absence of any controversy concerning the employee status of house staff, it is understandable that the

**57.** *Id.,* 642 F.2d at 498.

**58.** 29 U.S.C. § 152(3) (1976).

**59.** *See Brooklyn Eye & Ear Hospital,* 64 LRRM 1344 (1966) (New York); *Regents v. Michigan*

*Employment Relations Comm'n,* 389 Mich. 96, 204 N.W.2d 218 (1973) (Michigan).

**60.** *See Coverage of Nonprofit Hospitals Under National Labor Relations Act, 1973, supra* note 32, at 294.

legislative history does not contain an explicit directive to the Board to find them to be such. Surely, given this background, Congress did not expect too much in assuming that the Board, which is supposed to carry out its intentions, would not act in clear disregard of its views with respect to house staff as employees.

That the Board's house staff decisions are directly contrary to Congress' intentions is also made clear when the interpretation of congressional intent the Board would have us accept is examined. Before the Health Care Amendments were adopted in 1974, house staff had been engaging in collective bargaining pursuant to state law in a number of states. In two states that allowed collective bargaining in private hospitals—New York and Minnesota—they had been engaging in collective bargaining for some 20 years.[61] Legislation enacted by Congress at the urging of the house staff organizations, and for the purpose of extending the procedures of the Act to collective bargaining in nonprofit hospitals, has now been interpreted by the Board not only to deny house staff the right to engage in collective bargaining pursuant to federal law, but also to deny them even those rights they had previously enjoyed under state law.[62] This notwithstanding the fact that appellants sought and received, as the Board itself has acknowledged,[63] assurances from Congress that house staff would not be deprived of their right to collective bargaining by a Board finding that house staff are supervisory employees. The intent the Board would have us attribute to Congress is patently unreasonable. To permit the Board to alter Congress' intent under the guise of making "factual" determinations is even less acceptable.

The full extent to which the majority's decision departs from the teaching of *Leedom v. Kyne* is revealed by its willingness to concede that under its view of the *Kyne* doctrine courts are powerless to prevent the Board from making completely arbitrary decisions about who is an employee under the Act.[64] Presumably the Board is now free to decide that construction workers, plumbers, or carpenters, although they "possess certain employee characteristics,"[65] are "primarily" artisans and therefore are not employees within the meaning of the Act.[66] I cannot agree that the Board may, under the guise of making factual determinations, ignore congressional intent and completely rewrite the statute Congress enacted to "protect 'laborers' and 'workers' whose rights to organize and bargain collectively had not been recognized by industry"[67] by deciding that these workers are not employees under the Act. It is as if the majority has forgotten the Supreme Court's admonition in *Leedom v. Kyne* that courts "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers." 358 U.S. at 190, 79 S.Ct. at 185.[68]

---

**61.** *See* H.R. Rep. No. 1051, *supra* note 31, at 15 (Additional Views of Representatives Quie, Steiger, Eshleman, and Erlenborn).

**62.** Since the Board has successfully argued to the Second Circuit that national labor policy preempts any state jurisdiction over house staff, *see NLRB v. Committee of Interns & Residents, supra* note 2, its decision that house staff are not employees within the meaning of the Act means that they may not engage in collective bargaining under either state or federal law.

**63.** *See* note 34 *supra*.

**64.** Majority op., 642 F.2d at 499–500.

**65.** *Cedars-Sinai Medical Center, supra* note 1, 223 NLRB at 251.

**66.** Presumably this decision would be based on "policy reasons."

**67.** *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 279, 94 S.Ct. 1757, 1764, 40 L.Ed.2d 134 (1974).

**68.** It is worth stressing that District Court jurisdiction over the Board decision in this case will not lead to the problem of allowing dilatory tactics in representation proceedings that Congress was concerned about when it rejected the suggestion that all Board certification decisions be subject to judicial review. *See* text at notes 5–11 and note 10 *supra*. Since the Board has refused to certify appellants, no issue of delaying certification proceedings arises. Nor should there be concern that this case will create a precedent for District Court jurisdiction in other situations in which there may be an opportunity for delay. *This latter possibility*

## C

As discussed earlier, Congress limited judicial review to unfair labor practice orders under Section 10(f) in order to prevent dilatory tactics that would delay collective bargaining.[69] Courts have frequently rejected pre-election *Kyne* suits because the plaintiff would eventually have the opportunity to force the adverse party to seek a ULP order from the Board, at which time the merits of the case could be argued.[70] This approach derives from language in *Kyne* pointing out that for the professional employees in that suit "there is no other means, within their control," to protect their rights.[71]

In *Boire v. Greyhound Corp., supra,* for example, the Supreme Court stressed that because Board orders in certification proceedings are not really "final orders," they should not be challenged in court. Litigation following a ULP order, the Court said, can fully explore the validity of the "underlying certification order." 376 U.S. at 476–477, 84 S.Ct. at 896. Greyhound, which denied that it was a joint employer of maintenance crews, could have instigated a ULP order by refusing to bargain with the certified representatives of the workers. Then the bus line, as the Supreme Court stated, could have disputed its classification as a joint employer while contesting the ULP order. Thus the availability of eventual recourse to judicial review is an important consideration for a court asked to exercise its equitable powers under the *Kyne* exception.

But house staff, like the workers in *Kyne* and unlike the employer in *Boire,* have no feasible recourse other than this suit. Any attempt to provoke an unfair labor practice order through recognitional picketing would leave them vulnerable to damage suits by hospitals.[72] By its action the Board has simply excluded these employees from all Board process, from all NLRA rights. These employees have nowhere to turn but to the federal courts. As a result, I believe that the refusal to certify challenged in this suit should be viewed as a final order subject to challenge in the courts.

## D

Finally, it is necessary to consider the relationship between the purposes of the NLRA and the exercise of District Court jurisdiction requested by appellants. As my discussion thus far suggests, I believe that, in view of the nature of the Board's error in statutory interpretation, court review is fully consistent with the national labor policy.

In a case interpreting the definition of employee under the Wagner Act the Supreme Court stated that

> the avowed and interrelated purposes of the [NLRA] are to encourage collective bargaining and to remedy the individual worker's inequality of bargaining power by "protecting the exercise . . . of full freedom of association, self-organization,

provides an adequate basis for denying District Court jurisdiction in such cases.

**69.** *See* Part I *supra.*

**70.** *See, e.g., Smith Steel Workers v. A. O. Smith Corp.,* 420 F.2d 1, 6 (7th Cir. 1969); *McCulloch v. Libbey-Owens-Ford Glass Co., supra* note 16; *Lawrence Typographical Union v. McCulloch, supra* note 17, 349 F.2d at 708 (Bazelon, J., concurring).

**71.** *Leedom v. Kyne, supra* note 8, 358 U.S. at 190, 79 S.Ct. at 185. Some have claimed that the *Kyne* plaintiffs could have instigated a ULP order by refusing to bargain on behalf of the nonprofessional employees in the bargaining unit. *See Bullard Co. v. NLRB,* 253 F.Supp. 391, 395 (D. D.C. 1966); Note, *Supreme Court, 1958 Term,* 73 Harv. L. Rev. 126, 219 (1959).

This court's opinion in *Kyne* convincingly disputes that "remote and conjectural" contention:

> Nor is it likely that [the union's] refusal to bargain for the nine non-professionals would induce the employer to seek review since he would then be free to deal with all employees individually. Nor could we expect such refusal to induce any of the nine non-professionals to seek review. They are hardly likely to insist upon placing their fate in the hands of a reluctant bargaining representative.

*Leedom v. Kyne, supra* note 18, 249 F.2d at 492.

**72.** 29 U.S.C. § 187 (1976).

and designation of representatives of their own choosing * * *." * * * [73]

Public regulation of labor relations is designed to ensure orderly presentation of worker grievances and demands, and to reduce the strife involved in reconciling workers' interests with those of management.[74] These purposes also motivated the 1974 Health Care Amendments, which were aimed at preventing disruptions in patient care due to "recognition strikes and picketing." [75] Since I have concluded that the Board misconstrued the legislative direction that house staff be viewed as employees within the Act, exercise of District Court jurisdiction over this case can only support the goals of the national labor policy. Certification of appellants would largely eliminate recognition strikes and could lead to orderly collective bargaining—the "pervasive focus" of the NLRA.[76] Finally, there can be no claim that certification of appellants will delay collective bargaining under the Act, since house staff are currently excluded from statutory coverage.

My conclusion is fortified by a comparison between the situation of house staff here and the circumstances of the *Kyne* plaintiffs. Both groups suffered, through Board error, a loss of rights provided by the NLRA. But in *Kyne* the professional employees still enjoyed the benefits of self-organization and collective bargaining.[77] In contrast, house staff currently have no access to the protections of the NLRA or the machinery of the Board for resolving labor disputes. There can be no serious doubt as to court jurisdiction in such circumstances.

My conclusion does not disturb the Board's discretion in those broad areas in which it may be validly exercised. I simply find that the legislative intent to extend the benefits of the NLRA to house staff may not be contravened by administrative fiat. I have taken pains to emphasize that I leave the *Kyne* exception as I found it: in a narrowly defined set of circumstances, certification decisions of the Board that violate clear and mandatory congressional instructions and that are effectively final orders not otherwise reviewable are subject to review in the District Courts under Section 1337 of Title 28.

Consequently, I would reverse the judgment of the District Court and remand this case for further proceedings.

I respectfully dissent.

**73.** *NLRB v. Hearst Publications, Inc., supra* note 25, 322 U.S. at 126, 64 S.Ct. at 858.

**74.** *See* National Labor Relations Act § 1, 29 U.S.C. § 151 (1976).

**75.** *See* sources cited in note 31 *supra.* There were house staff strikes in New York City and Los Angeles in 1975. American Hospital Association, *supra* note 1, at 22–23. Government statistics show that in private hospitals generally well over half of the man-days lost due to strikes between 1965 and 1971 were the result of recognition strikes. *Coverage of Nonprofit Hospitals Under National Labor Relations Act, 1973, supra* note 32, at 246–252 (tables from U.S. Bureau of Labor Statistics).

**76.** *Internat'l Brhd of Electrical Wkrs v. NLRB, supra* note 24, 487 F.2d at 1170. Appellants also contend that the Board's rulings have un-constitutionally deprived them of due process and violated the Tenth Amendment. In view of my conclusion on the statutory issue, I do not reach those claims.

**77.** Indeed, it may be argued that the *Kyne* plaintiffs suffered little injury from the Board's action. The requirement that professional employees approve their inclusion in a bargaining unit with nonprofessional workers was designed to prevent situations where a small minority of professional workers would have their interests ignored by bargaining units dominated by other employees. S. Rep. No. 105 (pt. I), 80th Cong., 1st Sess. 11 (1947); H.R. Rep. No. 510, *supra* note 10, at 36. But the professionals in *Kyne* made up more than 95% of the bargaining unit, so the evil feared by Congress was at most a remote possibility.